Louis L. HERM et al., Plaintiffs,

v.

Daniel W. STAFFORD et al.,
Defendants.

No. 6651.

United States District Court,
W. D. Kentucky.

Dec. 6, 1978.

Spencer E. Harper, Jr., William W. Davis, Louisville, Ky., J. Vernon Patrick, Birmingham, Ala., for plaintiffs.

Henry J. Formon, New York City, Rufus Lisle, Lexington, Ky., for defendant, Dale S. Coenen.

## ORDER AND MEMORANDUM OPINION

### On Motion to Deny Class Action Certification

BALLANTINE, District Judge.

This matter is before the Court on the motion of the defendant, Dale S. Coenen, to deny class action certification as to the second amended complaint against him.

This lawsuit emerged from the demise of Daniel Boone Fried Chicken, Inc. (DBFC), a Kentucky corporation. The original complaint, filed June 23, 1970, alleged violations of the Securities Act of 1933, 15 U.S.C. Section 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C. Section 78a et seq., and Kentucky state law in connection with the offer and sale of DBFC securities. Named as defendants therein were certain officers and directors of DBFC and other allegedly "controlling persons" of DBFC as defined by the Securities Acts, 15 U.S.C. Sections 77o, 78t. An amended complaint was thereafter filed on October 15, 1970, in which Coenen was named a party defendant as a controlling person of DBFC under the Securities Acts. Allegations involving the Investment Company Act of 1940, 15 U.S.C. Section 80a–1 et seq., accompanied the allegations of Securities Acts irregularities. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certified the action as a class action by Order entered on February 11, 1971.

A second amended complaint, filed October 20, 1972, broadened and further detailed the previous allegations. Coenen was again classified as a controlling person of DBFC, and as a "de facto" or "de jure" director of DBFC. Material misrepresentations and omissions of fact were alleged concerning DBFC and Commonwealth Security Investors (CSI), partner to a reorganization with DBFC. Plaintiffs claimed injury by defendants' use of false, misleading and deceptive proxy solicitation materials, prospectuses, financial reports, and other statements made in news releases, brochures, corporate correspondence and promotional materials. Plaintiffs further alleged a conspiratorial course of dealings which operated as a fraud and deceit upon them.

Coenen's pending motion attacks the propriety of the action proceeding as a class action against him. He contends that no motion for class certification followed the second amended complaint, thereby compel-

ling the case to be tried on the basis of plaintiffs' individual claims. He further argues that, in light of several Supreme Court decisions since the class was certified, the February 11, 1971, Order is no longer valid. Lastly, Coenen argues that plaintiffs have failed to meet the prerequisites of Rule 23.

At the time Coenen became involved with DBFC, he was President of Coenen & Co., Inc., an investment banking and stock brokerage firm. The company was registered with the Securities and Exchange Commission (SEC), the New York Stock Exchange, the National Association of Securities Dealers, and the securities divisions of various states. His firm investigated investment opportunities and advised clients on the basis of such investigations.

Coenen was approached in early 1969 by DBFC, which at that time was in need of funds and investors. An initial and continuing problem with the company, however, was the lack of tangible financial information. DBFC was interested in selling a certain amount of its common stock to the public, supposedly through a registered public offering. Coenen met with DBFC officers in New York in the spring of 1969. He then visited their Kentucky offices in May, 1969, and attended the grand opening of a DBFC franchise in Richmond, Ky. (Plf's Ex. 95). It soon appeared that a substantial block of shares owned by defendant Dan Stafford's "group" was for sale. Stafford was the sole stockholder of Great Southern, Inc., which reportedly owned 35% of DBFC's outstanding common voting stock. Coenen did not know why Stafford was interested in selling control of the company, but one of the factors was an investigation by the Kentucky Division of Securities and a possible investigation by the SEC (Coenen Depo. 78).

On June 18, 1969, Coenen met in Lexington with defendants A. B. Chandler, Sr., Joseph Arnold, Leonard Nave, Dan Chandler, and John Morgan. The purpose of the meeting was to discuss the purchase of DBFC stock owned by Stafford. Coenen has repeatedly asserted that no such purchase should have occurred until he obtained fully audited financial data. However, on June 21, 1969, Arnold entered into a purchase agreement with Great Southern and Stafford (Plf's Ex. 49).

Coenen was elected to DBFC's board of directors by other board members on July 30, 1969, although he did not attend that meeting or the August 1, 1969, board meeting. Coenen asserts that he was never elected to a duly authorized board of directors. He was under the impression that he was sitting on a "steering committee" or "temporary board". Coenen became aware of his election to the board around August 8 or 9 when he met with A. B. Chandler, Sr., in Lexington (Coenen Depo. 93). He did attend the September 19, 1969, board meeting, at which DBFC's general condition was discussed, including the monthly net operating losses as described in the minutes of the meeting (Plf's Ex. 54). Coenen was still concerned with obtaining some "hard figures" on DBFC's financial condition, but could only discern that the operation was "an absolute mess" (Coenen Depo. 134). Coenen admittedly took no steps to inform the public or shareholders that the financial information available was either inaccurate or incomplete (Coenen Depo. 160).

The board of directors held a special meeting on October 17, 1969, at which time Coenen tendered a letter of resignation, contingent on the infusion of $150,000.00 into DBFC by a new investor group. Coenen claims that he based his decision to resign in part upon "the fact that you could not get the story on the operations from anyone in the organization. There was absolutely no coordination; no one knew what was going on. And you could never piece together really what were the facts." (Coenen Depo. 172.) Plaintiffs contend that Coenen remained involved with DBFC at least until June of 1970. The condition under which he resigned was never met, and Coenen knew of such failure by December of 1969 (Coenen Depo. 154). Coenen subsequently advanced $20,000.00 to the Settle & Holt accounting firm to pay DBFC's auditing expenses. The auditing bill was paid in March, 1970, with the

understanding that Coenen would be repaid out of the expected $150,000.00 investment (Coenen Depo. 146).

 Coenen contends that there has never been an order certifying the class of plaintiffs named in the second amended complaint. The class certification Order entered on February 11, 1971, referred to the first amended complaint. As such, Coenen argues that class certification was premature as to the second amended complaint, and that the action can proceed to trial only on the individual plaintiff's claims in the second amended complaint.

The Court has broad discretion to determine the propriety of class certification so long as it applies the criteria of Rule 23 correctly. *Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026 (6th Cir. 1977); 3B *Moore's Federal Practice,* Para. 23.50 at 1104–05. Rule 23(c)(1) provides that "as soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." The Court must closely examine the developing evidence and must seriously consider its power under Rule 23(c)(1) to alter or amend a class certification order. *Lamphere v. Brown University,* 553 F.2d 714 (1st Cir. 1977).

While it appears that there were differences between the class defined in the February 11, 1971, Order (par. 7) and the Court-approved notice dated February 10, 1971, the Court redefined the class per Order entered October 20, 1976. The class as defined therein has repeatedly been sus-

tained as proper. No fewer than five orders have been entered after the second amended complaint which implicitly confirmed the propriety of the class action. These orders include approval of supplemental notice to the class (August 22, 1973); court-approved notice to each class member and publication in local newspapers (October 20, 1976); findings in Pro Tanto Settlement Order that notice requirements were met by October 20, 1976 Order (March 10, 1977); extension of date on which proof of claims were to be filed (March 11, 1977); and court-approved supplemental notice to class members (April 8, 1977). Although the second amended complaint expanded plaintiffs' claims, it did not change the basic nature of the lawsuit. The Court has reconsidered its February 11, 1971, Order on more than one occasion and has chosen to continue the action under Rule 23. Such course appears to be sound, and the Court retains the power to alter or amend the class at an appropriate later date.

Coenen relies on three recent Supreme Court cases to limit the prosecution of claims under the anti-fraud provisions of the federal securities laws. He argues that under the authority of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); and *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), plaintiffs cannot fulfill their class representation aspirations.

 In *Hochfelder,* it was held that a private cause of action for damages will not lie under Section 10(b) of the 1934 Act or SEC Rule 10b–5[1] in the absence of any

---

1. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchanged—* * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission

may prescribe as necessary or appropriate in the public interest. 15 U.S.C. Section 78j(b).

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact

allegation of "scienter", i. e., intent to deceive, manipulate, or defraud on the part of the defendant. Coenen denies that the second amended complaint alleges intent to defraud or scienter on his part, thus failing to state a claim against him. However, the second amended complaint does in fact allege numerous instances of intentional or reckless conduct as required by *Hochfelder.* *See SEC v. Coffey,* 493 F.2d 1304, 1314 (6th Cir. 1973), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Peltz v. Northern Ohio Bank,* 430 F.Supp. 382, 384 (N.D.Ohio 1976). The acts, practices, courses of business dealings and transactions by the defendants allegedly furthered a conspiratorial scheme to defraud the plaintiffs. For example, Count I, paragraph four, alleges concealment of defendants' wrongdoings, certainly an intentional course of conduct.

■ Defendant disclaims any deliberate participation in the alleged fraudulent misrepresentations, and he decries subjection to such vexatious litigation as condemned in *Blue Chip.* The extent of Coenen's involvement with DBFC has been described above in some detail. This case does not involve the Supreme Court's concern for restricting Rule 10b–5 actions under *Blue Chip.* The action is not based upon a complaint with very little chance of success at trial, nor will the proof depend almost entirely on oral testimony. *See Blue Chip,* 421 U.S. at 740, 95 S.Ct. at 1927. For these reasons, defendant's reliance on *Blue Chip* is misplaced.

■ Coenen also argues that the plaintiffs are practicing "legalized blackmail" through the class action device, squeezing persons removed from the heart of the controversy, such as he. Coenen became involved with DBFC during a period germane to many of the unresolved issues raised by the plaintiffs. The distinction between innocent and guilty defendants need not be made at this point. Rather, the Court must

continue to apply standards of proof which comply with the class action requirements set forth in *Eisen.* Coenen's activities were not so remote from the core of the complaint as to violate *Eisen's* class action requirements.

In order to maintain a class action under Rule 23(b)(3), the Court must make findings of numerosity, commonality, typicality, and adequacy of representation. Common questions of law or fact must also predominate over questions affecting only individual members, and class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) F.R.Civ.P. *See Davis v. Avco Corp.,* 371 F.Supp. 782, 790 (N.D.Ohio 1974).

■ Coenen attacks plaintiffs' compliance with the requirements of Rule 23. In particular, the two most serious contentions raised by Coenen involve the "commonality" requirement of Rule 23(a)(2) and whether questions of law or fact common to the members of the class predominate over questions affecting only individual members under Rule 23(b)(3). Coenen describes the class action aspect in the second amended complaint's allegations as a "stewpot". He complains that plaintiffs have not specified any evidence containing misrepresentations, common to all defendants, to justify a class action against him. In addition, Coenen attempts to refute the typicality of plaintiffs' claims and the superiority of a class action.

Essentially, plaintiffs allege that the defendants' misstatements were made over an extended period of time pursuant to a common scheme. Defendants painted a picture of a growing and profitable enterprise when there was no tangible financial basis for such projections. Common questions of law or fact raised by plaintiffs include the failure to register DBFC securities as required by the SEC, a violation of the securi-

---

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice or course of business which operates or would operate as

a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. Section 240.10b–5.

ties laws. Plaintiffs claim that these omissions are likewise actionable under Rule 10b–5. Other common and interrelated omissions occurred in the May, 1969, prospectus, press releases, advertisements and mailings throughout the entire period in question. While different members of the class may have relied on different reports and statements, repeated misrepresentations as alleged herein satisfy the "common question" requirement. In *Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), plaintiffs estimated that 45 documents were issued containing financial information by which they were mislead. The Court upheld the "commonality" requirement and stated in part:

> "Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie v. Barrack,* 524 F.2d at 902.

*See Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Harris v. Palm Springs Alpine Estates,* 329 F.2d 909 (9th Cir. 1964).

The situation, omissions, and misrepresentations alleged by plaintiffs are "interrelated, interdependent, and cumulative;" "[l]ike standing dominoes . . . one misrepresentation . . . cause[s] subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements." *Fischer v. Kletz,* 41 F.R.D. 377, 381 (S.D.N.Y.1966). The class members are also united by the standard of care required of the various defendants and the similarity of the various documents involved. *Blackie v. Barrack,* 524 F.2d at 905. Therefore, the "commonality" requirement of Rule 23(a)(2)

has been adequately satisfied. *See Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685 (E.D.Pa. 1977); *Blumenthal v. Great American Mortgage Investors,* 74 F.R.D. 508 (N.D.Ga. 1976).

■ Likewise, the Rule 23(a)(3) requirement that the named plaintiffs' claims be typical of the claims of the class has also been satisfied in that plaintiffs basically alleged common misrepresentations and omissions. The Court may still use the flexibility available to it for the proper application of Rule 23 and divide the class into subclasses, Rule 23(c)(4), or make such other orders as are necessary, Rule 23(d).

■ Coenen next argues that common questions of law and fact do not predominate over the individual issues involved in this action. Defendant relies on *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880 (5th Cir. 1973), in which the substantive misrepresentations upon which the named plaintiff relied were oral. The plaintiff in *Simon* could not support his contention that similar misrepresentations were made to other members of the proposed class. The oral representations made to various plaintiffs were mere reiteration of the misstated financial information contained in reports and prospectuses. Nor does it appear that any of the instant plaintiffs had access to inside information as did the plaintiff in *Simon.* Therefore, there does appear to have been a common course of misrepresentations which affected the market value of DBFC stock materially. Such was not true in *Simon,* and for that reason *Simon* is not controlling in this case. *See Sargent v. Genesco, Inc.,* 75 F.R.D. 79, 85 (M.D.Fla.1977).

Coenen further suggests that "reliance" would become an issue as to the various defendants. Here, plaintiffs' cause of action is based upon both misrepresentations and nondisclosures. Differentiating between "misrepresentations" and "omissions" is not easily done. In *Little v. First California Co.,* 532 F.2d 1302, 1304 (9th Cir. 1976), the Court stated:

"The categories of 'omission' and 'misrepresentation' are not mutually exclusive. All misrepresentations are also non-disclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true."

Where a plaintiff alleges nondisclosure of material information by individuals in a fiduciary relationship to the plaintiff, the need for plaintiff to prove actual reliance on the omitted information is eliminated. *Affiliated Ute Citizens v. U. S.*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *See Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978); *Chelsea Associates v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975); *See also Forrestal Village, Inc. v. Graham*, 179 U.S. App.D.C. 225, 228, 551 F.2d 411, 414 (1977); Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 Harv.L. Rev. 584 (1975). Where a 10b–5 action alleges affirmative misrepresentations of material fact, proof of reliance may be required. The difficulty arises when both omissions and misrepresentations are alleged. Some courts discount the reliance element if plaintiffs "complain primarily of defendants' withholding relevant information . . . ." or if "the essence of the claim is one of nondisclosure . . . ." (Citations omitted). *In Re Home-Stake Production Co. Securities, Etc.*, 76 F.R.D. 351, 371 (N.D.Okl.1977). Plaintiffs cannot characterize their allegations as involving strictly misrepresentations or omissions. The two were intertwined in the alleged comprehensive scheme to defraud. Thus, proof of reliance on particular misrepresentations becomes unnecessary in such a case. *Blackie v. Barrack, supra; Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975); *Greenspan v. Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y.1978). Common questions predominate over the issues affecting only individual members, thereby satisfying the Rule 23(b)(3) requirement in that regard. *See Green v. Wolf Corp.*, 406 F.2d at 300.

The other requirement of Rule 23(b)(3)—that the class action device be superior to other available methods for the fair and efficient adjudication of the controversy—includes the problem of "manageability". Overwhelming authorities affirm the superiority of class actions in similar situations, *see Wolfson v. Solomon*, 54 F.R.D. 584 (S.D.N.Y.1972), particularly when investors may not otherwise seek recovery. *Korn v. Franchard Corp.*, 50 F.R.D. 57 (S.D.N.Y.1970), *rev'd and remanded*, 456 F.2d 1206 (2d Cir. 1972). Nor does this action approach the size of classes that have been held to be manageable and thus certified in other securities actions. *See, e. g., Grad v. Memorex Corp.*, 61 F.R.D. 88 (N.D. Cal.1973) (60,000 member class).

Defendant Coenen's motion for an order denying class action certification as to the second amended complaint as against him will be denied.

IT IS SO ORDERED this 6th day of December, 1978.